UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION )<br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to** *City of Stuart, Florida v. 3M Company et al,* <u>2:18-cv-03487-RMG</u> |
| CITY OF STUART, FLORIDA,<br><br>*Plaintiff,*<br><br>-*against* -<br><br>3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., TYCO FIRE PRODUCTS L.P., CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., KIDDE-FENWAL, INC., DYNAX CORPORATION, E.I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, L.L.C., CORTEVA, INC., DUPONT DE NEMOURS, INC., BASF CORPORATION, individually, and as successor in interest to Ciba Inc., and CLARIANT CORPORATION, individually, and as successor in interest to Sandoz Chemical Corporation;<br><br>*Defendants.* )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **SECOND AMENDED COMPLAINT** |

Plaintiff City of Stuart, Florida ("Stuart" or "Plaintiff"), by and through its attorneys, Weitz & Luxenberg, P.C. and Morgan & Morgan, P.A., as and for its complaint against Defendants 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Tyco Fire Products L.P., Chemguard, Inc., Buckeye Fire Equipment Company, National Foam, Inc., Kidde-Fenwal, Inc., Dynax Corporation, E.I. du Pont De Nemours and Company, The Chemours Company, The Chemours Company FC, L.L.C., Corteva, Inc., DuPont de Nemours, Inc, BASF Corporation, and Clariant Corporation (collectively "Defendants")), alleges as follows:

## I. INTRODUCTION

1.     Plaintiff City of Stuart owns and operates a public drinking water system and supplies drinking water to thousands of residents and businesses that depend on the City of Stuart for their water needs.  Plaintiff seeks to recover by this action the substantial costs necessary to protect the public and restore certain of its water supply wells, which are contaminated by the toxic chemicals per- and polyfluoroalkyl substances ("PFAS"), which include perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2.     PFOS and PFOA are highly toxic and carcinogenic chemicals that are or were components of Aqueous Film Forming Foam ("AFFF"), a firefighting suppressant agent used by the Stuart Fire Rescue, before PFOS- and PFOA-based AFFF was taken off the market.

3.     In years past, PFOS- and PFOA-based AFFF was used in training and firefighting activities and thereby released and discharged into the environment.  The PFOS and PFOA in the AFFF have migrated through the subsurface and into the groundwater, and now contaminate the water in Plaintiff's drinking water wells.

4.     The Defendants in this action manufactured and distributed AFFF and/or fluorosurfactant additives for use in AFFF that contaminated and continue to contaminate

2

Plaintiff's wells and the environment. The Defendants' AFFF and fluorosurfactant additives are believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (Toxic PFAS that included PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.")

5.     Among other things, the manufacturer Defendants knowingly and willfully manufactured, promoted, and sold PFOS- and PFOA-based AFFF and fluorosurfactant additives when they knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and/or unsafe, and threaten public health and welfare, as they have done with respect to Plaintiff's water supply.

6.     Plaintiff brings this lawsuit to recover compensatory and punitive damages, including all necessary funds to compensate Plaintiff for the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment to remove PFAS, including PFOS and PFOA, from its water supply, for any all costs incurred by Plaintiff complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water and to ensure that the responsible parties bear such expense, rather than Plaintiff, its taxpayers and its ratepayers.

## II. PARTIES

**Plaintiff**

7.     Plaintiff City of Stuart is an incorporated municipality of the State of Florida, with its municipal offices located at 121 SW Flagler Ave Stuart, FL 34994.

8.     Stuart, known as the "Sailfish Capital of the World", is home to more than 17,000 residents as well as businesses, and hosts a thriving tourism industry.

**Defendants**

9.     Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M does business throughout the United States, including conducting business in Florida. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires throughout the country.

10.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF-containing PFAS, which included but was not limited to PFOA and PFOS.

11.     3M designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.  3M's AFFF was used by Stuart Fire Rescue.

12.     Defendant Tyco Fire Products, LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin.  Tyco does business throughout the United States, including conducting business in Florida.

13.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul").

14.     At all times relevant, Tyco/Ansul manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF, which contained fluorocarbon surfactants containing PFAS.

15.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFAS, which included but was not limited to PFOA and PFOS. After Tyco

acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFAS, which included but was not limited to PFOA and PFOS.

16.     Tyco/Ansul designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

17.     Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard does business throughout the United States, including conducting business in Florida.  At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

18.     Chemguard designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

19.     Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in Florida.  At all times relevant, Buckeye Fire manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

20.     Buckeye designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

21.     Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501. National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products.  National Foam does

business throughout the United States, including conducting business in Florida. References to "National Foam" herein shall also refer to AFFF commercially manufactured, marketed and sold under the "Angus" name and "Angus Fire" brand.

22.     At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF, which contained fluorocarbon surfactants containing PFAS.

23.     National Foam designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

24.     Defendant Kidde-Fenwal, Inc. ("Kidde"), is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Florida.

25.     Kidde designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

26.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in Florida. Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.

27.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

28.     Dynax designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

29.     Dynax's fluorosurfactants and fluorochemical foam stabilizers were used in other manufacturers' AFFF products, including products manufactured by National Foam. National Foam's AFFF was used by Stuart Fire Rescue.

30.     Defendant E.I. du Pont De Nemours & Co. is a Delaware Corporation and does business throughout the United States, including conducting business in Florida. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

31.     E.I. du Pont De Nemours & Co. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

32.     Defendant The Chemours Company is a Delaware Corporation and conducts business throughout the United States, including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

33.     The Chemours Company designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

34.     The Chemours Company was incorporated as a subsidiary of E.I. du Pont De Nemours & Co. as of April 30, 2015. From that time until July, 2015, The Chemours Company was a wholly-owned subsidiary of E.I. du Pont De Nemours & Co. In July, 2015, E.I. Du Pont de Nemours & Co. spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to E.I. du Pont De Nemours & Co. stockholders, and The Chemours Company has since been an independent, publicly traded company.

35.     Defendant The Chemours Company FC, L.L.C. is a Delaware Corporation and conducts business throughout the United States including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

36.     The Chemours Company FC, L.L.C. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

37.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

38.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. du Pont De Nemours & Co. and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

39.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware. Corteva Inc. does business throughout the United States, including conducting business in Florida.

40.     Corteva designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

41.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

42.     Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

43.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend.  Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds

certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

44.    Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Florida.

45.    DuPont de Nemours, Inc. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF.

46.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont).  New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

47.    Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

48.    Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

49.    Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.  On information and belief, on or about 2008, BASF acquired Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) and is the successor-in-interest to Ciba, Inc. BASF does business throughout the United States, including conducting business in Florida.

50.     BASF has designed, manufactured, marketed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products

51.     BASF's component products were used in other manufacturers' AFFF products, including products manufactured by National Foam.  National Foam's AFFF, among others, was used by Stuart Fire Rescue.

52.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.  Clariant does business throughout the United States, including conducting business in Florida.

53.     On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

54.     Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products, including fluorosurfactants for Dynax.

55.     3M Company; Tyco Fire Products L.P; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; Kidde-Fenwal, Inc.; Dynax, Inc.; E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc.; BASF Corporation; and Clariant Corporation; are collectively referred to as "Defendants."

56.     Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS-containing

AFFF and/or PFAS additives for use in AFFF that was released into areas affecting Plaintiff's water supply, such that AFFF-related PFAS have contaminated Plaintiff's water supply; (b) acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS additives for use in AFFF would be released into areas affecting Plaintiff's water supply; (c) are legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Complaint; and (d) promoted PFAS-containing AFFF and/or PFAS additives for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

57.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

58.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

### III.    JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiff and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

60.     Plaintiff is direct-filing this Second Amended Complaint in the United States District Court for the District of South Carolina as permitted by Case Management Orders Nos.

3D & 3E entered by this Court in In Re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG.

61.     The United States District Court for the Southern District of Florida is the proper venue of origin where Plaintiff's claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

62.     The United States District Court for the Southern District of Florida is the proper "Home Venue" because, based on information and belief, each Defendant is a corporation or other business that has sufficient minimum contacts in Florida or otherwise intentionally avails itself of the Florida market either through the distribution or sale of AFFF products in the State of Florida so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

63.     Further, Venue is also proper in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because the events, omissions, and harms that are the basis of Plaintiff's claims occurred in substantial part in this judicial district.

64.     Plaintiff brings causes of action based solely on and arising under Florida Law. The claims of Plaintiff are for violations of Florida law that occurred exclusively in the State of Florida.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. PFOA and PFOS, Their Chemical Characteristics, and Risk in Groundwater

65.     Poly- and perfluroalkyl substances (collectively "PFAS compounds") are terms used to describe a group of organic flurorinated alkanes.  PFAS compounds have been used for decades to produce products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

66.    There are six long-chain PFAS compounds, which are divided into two sub-categories: (1) long-chain perfluoraoalkyl carboxylic acids (PFCAs) like PFOA, and (2) perfluoroalkane sulfonates (PFSAs), including perfluorohexane sulfonate (PFHxS) and PFOS. PFOS and PFOA compounds are the most toxic manmade chemicals of the PFAS family.

67.    PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond that is one of the strongest chemical bonds that occurs. PFOS and PFOAs are extremely persistent in the environment and in the human body, and have the potential to bioaccumulate and biomagnify in wildlife.  Bioaccumulation appears to be related to the length of the C-F chain; as the size of the chain increases, the compound becomes more bioaccumulative.

68.    PFOS and PFOA have unique characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water.  In short, once PFOS and/or PFOA are applied, discharged, disposed of, or otherwise released onto land, those compounds migrate through the subsurface and into groundwater, resist natural degradation, and are difficult and costly to remove from water.

69.    PFOA and PFOS contamination presents a significant threat to public health and welfare.  PFOA is readily absorbed in the body after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver.  Studies have shown that exposure to fluorochemicals that contain eight carbons or more ("C8"), such as PFOS and PFOA, may cause testicular cancer, kidney cancer, and liver damage in adults, as well as developmental

effects to fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty, and skeletal variations.

70.    There also have been studies linking C8s with autoimmune and endocrine disorders, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease, and pregnancy-induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOS or PFOA.

71.    Under the U.S. Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFOS and PFOA in humans.[1]

**B.    Defendants' History of Production of PFOA/PFOS and Commercialization of AFFF**

72.    3M began producing PFOA as part of a process called electrochemical fluorination (ECF) in the 1940s.  This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS.

73.    For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been 3M, through its supply of AFFF.

74.    In the 1960s, 3M began developing AFFF, which was created to extinguish Class B fires that are fueled by flammable liquid and particularly difficult to fight using traditional methods of extinguishing fires.  Class B fires cannot be safely extinguished with water.

75.    AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants.  When mixed with water, a solution forms producing

---

1 U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf

aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

76.     3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

77.     National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

78.     Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

79.     Dynax began to manufacture, market, and sell the raw materials for production of AFFF in the 1990s and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

80.     Buckeye began to manufacture, market, and sell AFFF in the 2000s.

81.     After its creation in the 1960s and entrance into the commercial market, AFFF was utilized by the Department of Defense and the US Navy to extinguish fuel-based fires during routine military drills. AFFF was also used in hundreds of bases across the country.

82.     Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

83.     In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

84.     In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition ("FFFC").

85.     In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

86.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

87.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

88.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

89.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

90.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

91.     After 3M exited the AFFF market, the remaining Defendants continued to manufacture and sell AFFF.

92.     The Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

93.     While the Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use AFFF that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

94.     The Defendants further did not act to remove AFFF from the stream of commerce.

95.     The Defendants did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of public water drinking wells.

96.     Accordingly, for many years after the original sale of AFFF, these AFFF products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils and waters, contamination public drinking water wells and endangering human health.

97.     The Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

1.     **3M's Knowledge of the Dangers of PFAS**

98.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

99.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

100.     By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

101.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment.

102.    An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

103.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

104.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

105.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

106.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

107.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

108.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

109.    Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

110.    This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

111.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

112.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment.

113.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

114.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

115.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

116.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

117.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS.  For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

118.    In response to pressure from the U.S. EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

119.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

120.    On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

121.    3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and contaminate the environment.

122.    Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS."

## 2.    Dupont's Knowledge of the Dangers of PFAS

123.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

124.    DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

125.    In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

126.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

127.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

128.    DuPont did not report this data or the results of its worker health analysis to any government agency or community.

129.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

130.    Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

131.    In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

132.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

133.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

134.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

135.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

136.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

137.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

138.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

139.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

140.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

141.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

142.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

143.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment.

### 3.    Other Defendant's  Knowledge of the Dangers of PFAS

144.    Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax, National Foam/Angus Fire, BASF Corporation, and Clariant Corporation knew, or at the very least should have known, that in their intended and/or common use, their AFFF and/or PFAS products would harm human health and the environment, including causing harm to Plaintiff.

145.    Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax, National Foam/Angus Fire, BASF Corporation, and Clariant Corporation knew, or at the very least should

have known that, their AFFF and/or PFAS products would contaminate Plaintiff's public water supply.

146.    Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

147.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

148.    DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

149.    All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants").

150.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

151.    The FFFC Defendants worked together to protect AFFF from scrutiny.

152.    Their close cooperation included messaging on PFOA's toxicological profile.

153.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

154.    FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

155.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

156.    FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market.  Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

157.    FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

158.    While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and Plaintiff.

**4.    Dupont's Spinoff of Chemours**

159.    In February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary.

160.    In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

161.    At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

162.    Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

163.    Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United Stated Environmental Protection Agency ("EPA")

alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource

Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds. At the

time, it was the largest such penalty in history.

164.    DuPont also promised to phase out production and use of PFOA by 2015.

165.    Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000

residents of Ohio and West Virginia for $343 million.

166.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a

panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local

water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235

million for ongoing medical monitoring of the affected community.

167.    After 8 years, the C-8 Science Panel found several significant diseases, including

cancer, linked to PFOA.

168.    Once the spinoff was complete, seven new members of the Chemours board were

appointed, for an eight member board of directors of the new public company.

169.    The new independent board appointed upon the completion of the spinoff did not

take part in the negotiations of the terms of the separation.

170.    In addition to the transfer of assets, Chemours accepted broad assumption of

liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific

details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

171.    Within the publicly available information about the transfer is the fact that

Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours

Liabilities," which is defined broadly to include, among other things, "any and all liabilities

relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

172.    Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

173.    Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

174.    Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

175.    Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

176.    In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

177.    The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

178.    The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

179.    As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

180.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

181.    Plaintiff's water supply has been, and continue to be, contaminated in varying amounts over time, as a result of Defendants AFFF containing PFAS and/or PFAS for use in AFFF, causing Plaintiff significant injury and damage.

**C.    The contamination of the Surficial Aquifer**

182.    The City of Stuart prides itself on providing its residents and businesses with outstanding drinking water of the highest quality, purity and taste.

183.    The City of Stuart obtains its drinking water supply from the Surficial Aquifer, which underlies the City of Stuart.

184.    To access the Surficial Aquifer, the City of Stuart relies on a system of 30 interconnected groundwater wells, which transmit raw water to a central Water Treatment Facility.

185.    There, the water is aerated, lime softened, settled, filtered, disinfected, and pumped through water distribution mains and service lines into approximately 4,000 residential and 500 commercial connections.

2:18-cv-03487-RMG     Date Filed 09/25/20     Entry Number 54     Page 28 of 48

186.    Although the Water Treatment Facility contains various technologies to ensure high quality water, it does not contain the specialized filtration technology required to remove PFOS and PFOA from a water supply.

187.    Stuart has the ability to pump its wells at varying levels, and to shut off wells if they show an unacceptable level of contaminants.

188.    Regardless of how many wells it pumps at any given time, however, Stuart must still provide, on an average, 3.5 million gallons of water a day to its residents and businesses.

189.    The Stuart Fire Rescue takes similar pride in its service to the community.

190.    The Stuart Fire Rescue is committed to proving the residents of Stuart with the highest level of safety and protection.

191.    To accomplish its mission, the Stuart Fire Rescue provides its emergency personnel with extensive education and training on the latest firefighting technology and procedures, including on the use of AFFF.

192.    For example, Stuart Fire Rescue purchased the Defendants' AFFF, trained its personnel in the use of AFFF, and routinely practiced applying AFFF so that its personnel would be ready to respond in an emergency.

193.    Stuart Fire Rescue typically conducted its training sessions in the open space behind its headquarters, located at 800 SE M.L.K. Jr. Blvd., Stuart, FL 34994.

194.    Indeed, Stuart Fire Rescue conducted training exercises in or around the property at 800 SE M.L.K. Jr. Blvd. for decades using AFFF manufactured by Defendants.

195.    Instructions and warning labels affixed to the AFFF containers by the Defendants did not adequately describe the scope of danger associated with storage, use, clean up, and disposal of AFFF, or the procedures necessary for the safe storage, use, clean up, and disposal of AFFF.

196.    Defendants were aware of the health risks associated with use, disposal and bioaccumulation of AFFF components, but did not warn the users of the AFFF, including City of Stuart and Stuart Fire Rescue.

197.    Defendants were aware of the health risks of introducing AFFF into the environment, but did not warn the users of the AFFF, including the City of Stuart and Stuart Fire Rescue.

198.    At no time during the relevant period did the Defendants warn Stuart Fire Rescue that the ingredients in the AFFF were persistent, bioaccumulative, and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground water, contaminate the aquifer located beneath Stuart, thereby contaminating the Stuart drinking water and exposing thousands of innocent residents to water contaminated with dangerous chemicals.

199.    In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

200.    3M and the other defendants had known of these dangers for years.

201.    Even though 3M ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used manufactured, sold, distributed and/or redistributed a Toxic Surfactant-based AFFF recalled its dangerous products or warn users of AFFF of its toxic danger, including City of Stuart and Stuart Fire Rescue.

202.    To the contrary, the other Defendants willingly stepped-in to fill the void left when 3M exited the market.

**D.      Plaintiff's Discovery of Toxic Chemicals in Their Drinking Water.**

203.     Prior to 2012, municipal water providers, such as the City of Stuart, were not required to test their drinking water for the presence of PFOS or PFOA, and tests for PFOS and PFOA were rare.

204.     In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), which thereby required certain water providers across the country, including the City of Stuart, to test their water for the presence of PFOS and PFOA at the point of entry to the water distribution system.

205.     Plaintiff first learned of the presence of PFOS and PFOA in its water in May 2016 when the Florida Department of Environmental Protection informed the City that the test results taken in response to the "UCMR3" exceeded the Water Health Advisory that the EPA had identified at 70 parts per trillion as recorded at the City's point of entry to the water distribution system.

206.     Those tests showed the presence of PFOS and PFOA above the 2016 Health Advisory Levels at the point of entry to the water distribution system.

207.     Upon finding PFOS and PFOA at the point of entry to the water distribution system, Plaintiff subsequently tested its individual wells.

208.     Plaintiff thereafter learned that several of its wells, especially those in the vicinity of its Fire Rescue Station, had high levels of PFOS and PFOA.  Plaintiff immediately took those wells out of production.

209.     In addition, Plaintiff also learned that nearly all of its wells had some level of PFOS and/or PFOA.

210.    Plaintiff has since determined that the source of the contamination is the use of AFFF at the Stuart Fire Rescue property.

211.    As set forth herein, Defendants knowingly manufactured, sold, and distributed dangerous and defective products, failed to provide proper warnings, and failed to recall their products when they took them off the market.

## V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Defective Product – Strict Liability Failure to Warn

212.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

213.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

214.    At all times relevant to this litigation, Defendants' AFFF and PFAS surfactants for use in AFFF reached their intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

215.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the foreseeable risks associated with the reasonably foreseeable uses of their products.

216.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF and/or PFAS surfactants for use in AFFF.

217.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

218.    The generally recognized and prevailing best scientific and medical knowledge at all times relevant demonstrated that the Toxic Surfactants in Defendants' AFFF and/or PFAS surfactants for use in AFFF could contaminate groundwater and local drinking water supplies with toxic and carcinogenic chemicals.

219.    The generally recognized and prevailing best scientific and medical knowledge at all times relevant demonstrated that the Toxic Surfactants in Defendants' AFFF and/or PFAS surfactants for use in AFFF had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

220.    The Defendants failed to provide warnings of the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in AFFF could result in the contamination of groundwater and, ultimately, drinking water supplies.

221.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF and/or PFAS surfactants for use in AFFF were inadequate.

222.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

223.    Had Defendants provided adequate instructions and warnings, the contamination of the groundwater and drinking water supply with toxic and carcinogenic chemicals would have been reduced or eliminated.

224.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF and/or PFAS surfactants for use in AFFF unreasonably dangerous and defective products.

225.    Plaintiff could not have reasonably discovered the defects and risks associated with use of Defendants' AFFF and/or PFAS surfactants for use in AFFF.

226.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

227.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination from their AFFF and/or PFAS surfactants for use in AFFF, the groundwater and drinking water in and around the City of Stuart became contaminated with PFOS and PFOA.

228.    As a direct and proximate result of Defendants' failure to warn of the potential for groundwater and drinking water contamination, the City of Stuart has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and expend significant sums to plan for treatment of its water to make it safe.

229.    As a direct and proximate result of Defendants' failure to warn of the potential for groundwater and drinking water contamination, the City of Stuart will incur additional costs for the construction of a water treatment facility capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facility and additional costs complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water.

230.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

231.    Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

232.    Defendants' contamination of the public water supply constituted a public wrong.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Negligent Failure to Warn

233.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

234.    A product is defective when the foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

235.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

236.    At all times relevant to this litigation, Defendants' AFFF and/or PFAS surfactants for use in AFFF reached their intended consumers and users without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

237.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the foreseeable risks associated with the reasonably foreseeable uses of their products.

238.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF and/or PFAS surfactants for use in AFFF.

239.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

240.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF and/or PFAS surfactants for use in AFFF could contaminate groundwater and local drinking water supplies with toxic and carcinogenic chemicals.

241.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF and/or PFAS surfactants for use in AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

242.    The Defendants failed to provide warnings of the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in AFFF could result in the contamination of groundwater and, ultimately, drinking water supplies.

243.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF and/or PFAS surfactants for use in AFFF were inadequate.

244.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

245.    Had Defendants provided adequate instructions and warnings, the contamination of the groundwater and drinking water supply with toxic and carcinogenic chemicals would have been reduced or eliminated.

246.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF and/or PFAS surfactants for use in AFFF an unreasonably dangerous and defective product.

247.    Plaintiff could not have reasonably discovered the defects and risks associated with the AFFF and/or PFAS surfactants for use in AFFF.

248.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are liable in damages to the Plaintiff.

249.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination from their AFFF and/or PFAS surfactants for use in AFFF, the groundwater and drinking water in and around the City of Stuart was contaminated with PFOS and PFOA.

250.    As a direct and proximate result of Defendants' failure to warn of the potential for groundwater and drinking water contamination, the City of Stuart has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and expend significant sums to plan for treatment of its water to make is safe.

251.    As a direct and proximate result of Defendants' failure to warn of the potential for groundwater and drinking water contamination, the City of Stuart will incur additional costs for the construction of a water treatment facility capable of removing PFOS and PFOA from its water supply, additional costs in the future for the operation and maintenance of that water treatment facility and additional costs complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water.

252.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of Plaintiff City of Stuart and the residents and businesses who rely on the drinking water that Plaintiff provides.

253.    Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

### Defective Product - Design Defect

254.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

255.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in AFFF.

256.    As manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF or chemicals for use in AFFF that were free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with it.

257.    Defendants breached that duty because the AFFF and/or PFAS surfactants for use in AFFF that they manufactured, sold or distributed was dangerous to an extent beyond that contemplated by an ordinary consumer when used in its intended and reasonably foreseeable manner.

258.    Defendants, as manufacturers, sellers, and distributors of AFFF and/or PFAS surfactants for use in AFFF placed into the stream of commerce, are deemed experts with respect to their product.

259.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF and/or PFAS surfactants for use in AFFF were toxic and carcinogenic and could lead those exposed to those toxic chemicals and/or their breakdown products to develop serious medical conditions.

260.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF and/or PFAS surfactants for use in AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

261.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF and/or PFAS surfactants for use in AFFF that they manufactured, sold, and distributed would require those who used groundwater in the vicinity of areas where AFFF was

stored, used, or released, including Plaintiff, to design, install, operate and maintain costly filtration devices to make the water safe for human use and consumption.

262.    The risks of AFFF and/or PFAS surfactants for use in AFFF were not obvious to Plaintiff.

263.    Plaintiff could not have reasonably discovered the defects and risks associated with use of AFFF and/or PFAS surfactants for use in AFFF.

264.    Defendants' AFFF and/or PFAS surfactants for use in AFFF were far more dangerous than an ordinary consumer would expect when used, as designed, in its intended or reasonably foreseeable manner.

265.    Defendants' AFFF and/or PFAS surfactants for use in AFFF were, therefore, unreasonably dangerous.

266.    Defendants' AFFF and/or PFAS surfactants for use in AFFF were, therefore, defective.

267.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

268.    As a direct and proximate result of Defendants' manufacture, sale, or distribution of a defective product, the City of Stuart has had to remove some of its wells from service, expend significant sums to investigate the source and extent of the contamination, and expend significant sums to plan for treatment of its water to make is safe for human use and consumption.

269.    As a direct and proximate result of Defendants' failure to warn of the potential for groundwater and drinking water contamination, the City of Stuart will incur additional costs for the construction of a water treatment facility capable of removing PFOS and PFOA from its water supply, additional costs in the future to operate and maintain that water treatment facility and

additional costs complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water.

270.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

271.    Defendants' conduct was so reckless or wanting in care that it constituted intentional or grossly negligent conduct.

272.    Defendants' contamination of the public water supply constituted a public wrong.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### Negligence

273.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

274.    The Defendants had a duty to manufacture, market, and sell their AFFF and/or PFAS surfactants for use in AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

275.    Defendants knew or should have known that the manufacture of AFFF and/or PFAS surfactants for use in AFFF containing Toxic Surfactants was hazardous to human health and the environment.

276.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF and/or PFAS surfactants for use in AFFF using Toxic Surfactants because it was a near certainty that the chemicals would migrate from the locations where it is used and contaminate the ground water and drinking water supply in the surrounding areas.

277.    Defendants knew or should have known that the Toxic Surfactants used in the manufacture of their AFFF and/or PFAS surfactants for use in AFFF do not degrade, remain in the environment for decades, and bioaccumulate, thereby creating a potential health risk that could last for many years.

278.    Plaintiff was a foreseeable victim of the harm caused by Defendants' AFFF and/or PFAS surfactants for use in AFFF.

279.    As a result of Defendants' breach of their legal duties, the drinking water wells on which Plaintiff relies to provide potable water to its customers became contaminated with unsafe levels of PFOS and PFOA.

280.    Plaintiff will continue to suffer damages and expenses in the future.

281.    Defendants' manufacture, marketing, and sale of AFFF and/or PFAS surfactants for use in AFFF, despite their knowledge of the risks of widespread contamination of the groundwater and drinking water supplies with toxic and carcinogenic chemicals, including Plaintiff's, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

### Private Nuisance

282.    Plaintiffs hereby incorporate by reference the allegations set forth in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

283.    Defendants' wrongful conduct resulted in the interference with Plaintiff's usufructuary right to the use of groundwater for providing potable water to its customers through the invasion of hazardous and toxic substances into the Plaintiff's wells.

284.    The Defendants are liable for a nuisance because their conduct was the legal cause of an invasion of the Plaintiff's interest in the use of groundwater, and the invasion was intentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct.

285.    Defendants' negligent, reckless and wanton acts proximately caused Plaintiff's property damage.

286.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered damages including, but not limited to, the following: (1) loss of the beneficial use of its groundwater for serving water to its customers; and (2) past and/or future costs for appropriate testing to determine contamination and remediation.

287.    Defendants' manufacture, marketing, and sale of AFFF and/or PFAS surfactants for use in AFFF, despite their knowledge of the risks of widespread contamination of the groundwater and drinking water wells with toxic and carcinogenic chemicals, including Plaintiff's,

among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor for compensatory and punitive damages, together with prejudgment interest, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### Violation of Florida's Uniform Fraudulent Transfer Act
**(E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)**

288.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-211 of this Complaint as if they were set forth at length herein.

289.    Plaintiff seeks equitable and other relief pursuant to the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726.101, *et seq.,* against E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the "FUFTA Defendants").

290.    Under the FUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a)    With actual intent to hinder, delay, or defraud any creditor of the debtor; or (b)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2.    Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105.

291.    The FUFTA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

292.    The FUFTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. du Pont de Nemours and Company's assets out of the reach of parties such as Plaintiff that have been damaged as a result of the FUFTA Defendants' conduct, omissions, and actions described in this Complaint.

293.    It is primarily E. I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS surfactant for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiff's drinking water supply and injure the Plaintiff.

294.    As a result of the transfer of assets and liabilities described in this Complaint, the FUFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS surfactants for use in AFFF.

295.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability

for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

296.     The FUFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

297.     At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

298.     Pursuant to Fla. Stat. § 726.108, Plaintiff seeks avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to the FUFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

299.     Plaintiff further seeks all other rights and remedies that may be available to it under FUFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries she has suffered as alleged in this Complaint.

## VI. DAMAGES

300.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

301.     Plaintiff seeks monetary damages for each violation of the First through Sixth Claims for Relief.  In particular, Plaintiff seeks monetary damages:

a.  to compensate Plaintiff for the increased costs to obtain drinking water, including the costs of alternative drinking water sources and/or the installation and maintenance of an adequate filtration system;

b.  for any and all costs of complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water;

c.  for such other monetary damages as are required to fully compensate Plaintiff for the losses they have and will continue to suffer as a result of Defendants' conduct;

d.  for delay damages, including pre-judgment and post-judgment interest according to law; and

e.  Plaintiff seeks punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

## VII. PRAYER FOR RELIEF

Plaintiff City of Stuart seeks judgment against all Defendants for:

1.  Compensatory damages arising from PFOA and PFOS contamination of groundwater and drinking water supply wells, including but not limited to:

(i)  costs of investigation of contamination;

(ii)  costs of testing and monitoring;

(iii)  costs of providing water from an alternate source;

(iv)  costs of installing and maintaining a wellhead treatment and adequate filtration system;

(v)  costs of installing and maintaining a wellhead protection program;

(vi)  costs of installing and maintaining an early warning system to detect PFOA and/or PFOS before it reaches Plaintiff's wells;

(vii)  any other response costs or other expenditures incurred to address PFOA and/or PFOS contamination, including, but not limited to, any and all costs complying with the Florida Department of Environmental Protection plan of remediation arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and drinking water; and

(viii)  interest on the damages according to law;

2. Punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future;

3. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

4. Prejudgment interest; and

5. Any other and further relief as the Court deems just, proper, and equitable.

## VIII. JURY TRIAL DEMANDED

Plaintiff City of Stuart demands a trial by jury as to all issues and defenses.

Respectfully Submitted,

Dated: September 25, 2020

__/s/ Frank Petosa_____
Frank M. Petosa
FL Bar No. 972754
**MORGAN & MORGAN, P.A.**
fpetosa@forthepeople.com
8151 Peters Road, 4th Floor
Plantation, FL 33324
Telephone: (954) 327-5366
Facsimile: (954) 327-3018

**WEITZ & LUXENBERG, P.C.**
Robin L. Greenwald
(pro hac vice)
Nancy M. Christensen
(pro hac vice anticipated)
rgreenwald@weitzlux.com
nchristensen@weitzlux.com
700 Broadway
New York, NY 10003
Tel.: 212-558-5500
Fax: 212-344-5461

Attorneys for Plaintiff